**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA**

**NEW ORLEANS HOME FOR INCURABLES, INC.**　　　**CIVIL ACTION**

**VERSUS**　　　　　　　　　　　　　　　　　　　　**NO. 12-2306**

**BRUCE D. GREENSTEIN,** *Secretary of Louisiana*　　　**SECTION: "G"(5)**
*Department of Health and Hospitals*

**ORDER AND REASONS**

Before the Court, among other matters, is New Orleans Home for Incurables, Inc.'s, doing

business as John J. Hainkel, Jr., Home and Rehabilitation Center's (hereinafter "Hainkel Home")

Motion for Preliminary Injunction,[1] wherein it requests that this Court issue a preliminary injunction

enjoining and ordering the Secretary of the Louisiana Department of Health and Hospitals ("DHH"),

Bruce Greenstein, (hereinafter "Secretary" or "Greenstein"):

> (1) from terminating the Hainkel Home Medicaid provider agreement, prior to a final
> decision from the Secretary following an Administrative Hearing on the merits of such a
> termination and exhaustion of all administrative and judicial proceedings;

> (2) from terminating the Hainkel Home Medicaid provider agreement prior to a final
> decision from the Secretary following an Administrative Hearing on the merits of whether
> Hainkel Home's nursing home license should be revoked and exhaustion of all
> administrative and judicial proceedings (since the termination of the provider agreement is
> based on the license revocation proceeding);

> (3) from seeking to terminate Hainkel Home's Medicaid provider agreement under the
> Medicaid Integrity Law, La. R.S. 46:437.10, because the Secretary has offered no grounds
> thereunder; and

> (4) from ordering Hainkel Home to notify its residents in a meeting or otherwise of the
> termination of the provider agreement and/or the revocation of the license prior to a final

---

[1] Rec. Doc. 2.

decision from the Secretary following an Administrative Hearing on the merits of such termination/revocation and exhaustion of all administrative and judicial proceedings.[2]

Before the Court addresses the Preliminary Injunction, it first confirms its earlier conclusion made in deciding a Motion to Dismiss by Secretary Greenstein when it decided that this Court has subject matter jurisdiction to hear this matter; although Hainkel Home has not exhausted its administrative remedies, the evidence supports this Court's prior ruling that Hainkel Home's claims

---

[2] Rec. Doc. 71 at pp. 1-2. Originally Hainkel Home requested that this court issue injunctive relief enjoining the Secretary from:

(1)     from terminating the Hainkel Home Medicaid provider agreement, prior to a final decision from the Secretary following an Administrative Hearing on the merits of such a termination and exhaustion of all administrative and judicial proceedings, subject to a Court review, if warranted;

(2)     from terminating the Hainkel Home Medicaid provider agreement,  prior to a final decision from the Secretary following an Administrative Hearing on the merits of whether the Hainkel Home nursing home license should be revoked and exhaustion of all administrative and judicial proceedings, subject to a Court review, if warranted;

(3)     ordering the Secretary to identify which administrative regulatory scheme is being followed in determining whether to terminate Hainkel Home's Medicaid provider agreement;

(4)     from revoking Hainkel Home's nursing home license, prior to a final decision from the Secretary following an Administrative Hearing on the merits of such a termination and exhaustion of all administrative and judicial proceedings, subject to a Court review, if warranted;

(5)     from engaging in the September 27, 2012 IDR hearing fo the purpose of considering Hainkel Home's appeal of the license revocation as violative of Hainkel Home's due process rights;

(6)     from seeking to terminate Hainkel Home's nursing home license under the Medicaid Integrity Law, La R.S. 46:437.10, because the Secretary has offered no grounds thereunder;

(7)     from ordering Hainkel Home to notify its residents in a meeting or otherwise of the termination of the provider agreement and/or the revocation of the license prior to a final decision from the Secretary following an Administrative hearing on the merits of such termination/revocation and exhaustion of all administrative and judicial proceedings, subject to a Court review, if warranted; and

(8)     ordering that Hainkel Home is entitled to a mandatory injunction requiring the Secretary to comply with La. R.S. 40:2009.7(B), LAC tit. 50:III:10167(I)(b), and LAC, tit. 48:I:9479 (i.e. appoint a three member board who will hold and evidentiary hearing on the license revocation issue).

See Rec. Doc. 2. However, after the parties entered into certain stipulations which will be discussed at length *infra*, several of the original demands became moot. See *infra* Part I.D.2.

meet the requirements of the "entirely collateral" exception to exhaustion of administrative remedies prerequisite to federal court jurisdiction.

However, regarding whether Hainkel home has a protectable property right in the Medicaid provider agreement, a question of first impression for this Court, for the reasons to follow, the Court need not resolve that issue here, there being other grounds to base its decision.

Accordingly, after considering the motion, the memorandum in support, the opposition to the motion, the parties' pre-hearing briefs, the evidence at trial, the parties' post-hearing briefs, and the applicable law, the Court finds that Hainkel Home's claims trigger subject matter jurisdiction of this Court; Hainkel Home has stated a claim upon which relief can be granted, and the Court will grant Hainkel Home's Motion for a Preliminary Injunction, for the reasons explained below, and enjoin Secretary Greenstein from terminating Hainkel Home's Medicaid provider agreement based upon the suspended nursing home license revocation and further enjoins the Secretary from requiring Hainkel Home to notify its residents in a meeting or otherwise of the termination of its Medicaid provider agreement and/or revocation of the nursing home license while the revocation of the nursing home license is suspended pending review and judicial appeal.

## I. Background

### A. History of Hainkel Home

The New Orleans Home for the Incurables ("NOHI") was founded in 1891.  It operates as a Louisiana nonprofit corporation, providing services to those with serious illnesses and its "primary areas of service are comprehensive medical and nursing services for long term care residents, and treatment and rehabilitation for the injured and ill."  In 1892, it purchased the property that is now

612 Henry Clay Avenue and constructed a building.  Initially the facility housed only women, but by 1906 a children's wing was constructed, followed by a ward for men in 1913.  From its inception until 1979, the NOHI board was directly responsible for the ownership and operation of the home, including employing licensed professionals as staff.

In 1979, the State of Louisiana took over the facility and its operation.  However, in the 2010 Legislative Session, the Louisiana Legislature passed Revised Statute 40:16.3 which allows NOHI, now known as Hainkel Home (named on behalf of famed Louisiana state legislator John J. Hainkel, Jr.), to operate the facility, while the state retains ownership of the land, building, and appurtenances. The statute further requires that Hainkel Home remain "a long-term care facility that provides nursing home level services and adult day health services," and "that the facility shall be operated by New Orleans Home for the Incurables."[3] However, the statute expressly states that "the lease shall terminate if the facility ceases to operate as a long-term care facility."[4]  In addition, Section B(5) of the statute established that Hainkel Home was to receive Medicaid payments at a rate to be set later that year, subject to approval by the Centers for Medicare and Medicaid Services. Pursuant to this statute, Secretary Greenstein, Mary Rodrigue, president of Hainkel Home, and Paul Rainwater from the Louisiana Division of Administration, signed a lease in late February 2011.[5] The lease provides that Hainkel Home will pay the state a maximum of $400,000 per year to lease the property.[6] Moreover, the lease agreement only allows for early termination premised upon cause;

---

[3]  La. R.S. 40:16.3(C)(1), (C)(4).

[4]  La. R.S. 40:16.3(C)(8).

[5]  Rec. Doc. 40-7. Amendments to the lease were signed by these parties in March 2011 as well. *See id.* at pp. 21-22.

[6]  *Id.* at p. 3.

however, "the canceling party shall first give the other party written notice specifying the other party's failure and the party shall have the opportunity to attempt to correct the failure within thirty (30) days after receipt of such notice."[7] On April 19, 2011, Hainkel Home took over operation of the facility.

### B. Louisiana Medicaid Program

"Medicaid is a cooperative federal-state program through which the federal government provides financial assistance to states so that they may furnish medical care to needy individuals. Although participation in the program is voluntary, participating states must comply with certain requirements imposed by the Medicaid Act, and regulations promulgated by the Secretary of Health and Human Services. To qualify for federal assistance, a state must submit to the Secretary [of Health and Human Services] and have approved a plan for medical assistance, 42 U.S.C. §1396a(a), that contains a comprehensive statement describing the nature and scope of the state's Medicaid program. 42 C.F.R. §430.10 (2007)."[8]

Federal and state agencies monitor facilities' compliance with regulations through surveys. In Louisiana, "DHH is designated as the administering agency of the Louisiana Medicaid program along with all fiscal components, and its Health Standards Section ("HSS") performs the surveys for CMS [Centers for Medicare and Medicaid Services]."[9] CMS is a federal agency that is principally responsible for these surveys.

---

[7]   *Id.* at p. 6.

[8]   *Id.* at pp. 6-7

[9]   Rec. Doc. 33 at p. 8.

"Complaint survey protocol customarily consists of HSS surveyors going on site to investigate [a] complaint, after which the complaint will be either unsubstantiated, meaning no deficiencies were found, or substantiated, in which HSS determined deficiencies."[10] After the survey, "DHH will issue a notice informing the facility of the deficiencies. Attached to this notice is the statement of deficiencies (CMS Form 2567 or State Form) listing each deficiency or tag under the applicable federal regulation, the findings, as well as a memorandum discussing the components for a plan of correction."[11] The notice also contains a memorandum explaining the informal dispute resolution process. "In addition, the facility is normally required to submit a Plan of Correction ("POC"), identifying how the facility plans to correct non-compliance as identified in the statement of deficiencies on the CMS Form 2567 or State Form."[12]

After the state receives the POC, "HSS will conduct a follow-up survey or conduct an evidence review."[13] The Secretary explains further that:

> It should be noted that follow-up surveys are abbreviated surveys. An abbreviated survey is a survey other than a standard survey that is focused on certain areas of the regulatory language and evaluation for compliance. This type of survey can result from complaints received or it can be a survey to return to the facility in order to follow-up on corrections of cited deficient practices. After the follow up survey, DHH notifies the facility whether it is in substantial compliance with the federal regulations previously identified and cited in either the CMS Form 2567 and/or State Form. Notwithstanding federal compliance, the same notice informs that if the facility is not in compliance with state requirements, it will receive notification of this in a separate letter. Notice to a facility that it is in substantial compliance with federal participation requirements neither precludes CMS from issuing a Civil

---

[10]  *Id.*

[11]  *Id.*

[12]  *Id.*

[13]  *Id.* at p. 9.

6

Money Penalty (CMP), nor does it preclude the state from taking action pursuant to state minimum licensing standards.[14]

Hainkel Home and its Administrator, Robert Rodrigue, contend that 98% of Hainkel Home's residents pay for their care through the state Medicaid program, but elsewhere Hainkel Home stated that 73 of its 82 residents rely on Medicaid to fund their care.[15] Hainkel Home participates in the federal Medicaid program pursuant to a provider agreement with the United States Department of Health and Human Services for Medicare and Medicaid Services.[16] Hainkel Home also has a provider agreement with the State, through DHH. Defendant Secretary Greenstein is responsible for the administration and regulation of the Louisiana Medicaid program and for issuing nursing home licenses for such facilities, including Hainkel Home, which is required for such homes to operate in the state of Louisiana.[17] In the memoranda in opposition to the preliminary injunction, the Secretary succinctly described the administrative and legal framework of the state licensing laws:

> Louisiana law prescribes that "[a]ll nursing homes are under the jurisdiction of the state Department of Health and Hospitals," and no person shall open, conduct, manage or maintain a nursing home without a license or provisional license from the department." In addition, the Louisiana Legislature charged that DHH "shall prescribe and publish minimum standards," and may adopt new rules and regulations relating to the operation and conduct of nursing homes and the care, treatment and maintenance of the residents thereof." Pursuant to the aforementioned legislative authority, DHH has promulgated the Nursing Homes Minimum Licensing Standards which govern aspects of nursing home operations for licensed facilities. As a licensed nursing home in Louisiana, Hainkel Home is obligated to maintain compliance with all state laws and minimum standards, rules, and regulations promulgated by DHH; and, violation of or non-compliance with same may result in

---

[14] *Id.*

[15] Rec. Doc. 71 at p. 28; *see also* Tr. R. p. 185 (Q: Of those folks who are currently residents or patients, how many of them are on Medicaid? A: At least 98 percent)(testimony of Mr. Rodrigue). Elsewhere, Hainkel Home stated that "87% of Hainkel Home residents have their health care paid for by Medicaid." Rec. Doc. 60 at p. 1.

[16] Rec. Doc. 1. at ¶ 2.

[17] *Id.* at ¶ 3; Ex. 1.

license revocation. Furthermore, pursuant to La. R.S. 40:2009.7, the Secretary of the Department of Health and Hospitals has the power to revoke a nursing facility's license when an investigation determines the license is in nonconformance with or in violation of the provisions of La. R.S. 40:2009.6.[18]

According to the Secretary:

> Since April 19, 2011, DHH has performed the following surveys at Hainkel Home: two Life Safety Code ("LSC"), one LSC follow-up survey, two Certification and Licensing Survey, one Certification and Licensing follow-up survey, twelve complaint surveys, and eight complaint follow-up surveys. Since April 2011, DHH has received 17 complaints and 1 self-reported incident for Hainkel Home, resulting in numerous on-site complaint surveys from which 8 complaints were substantiated. Just as with any other nursing home complaint, HSS triaged each complaint upon receipt, and determined that the complaint warranted an on-site complaint investigation. For Hainkel Home alone, since April 19, 2011, DHH has spent over 1,504.5 total survey hours at Hainkel home costing the state of Louisiana over $62,346.48, excluding all travel costs.[19]

### C. Actions Leading to the Current Dispute

#### 1. Nursing Home License Revocation

On June 26, 2012, the Secretary sent a letter to Hainkel Home, informing Hainkel Home that its license to operate ("nursing home license") in Louisiana was to be revoked because of numerous alleged "instances of deficiencies."[20] Pursuant to several complaints, DHH initiated surveys of Hainkel Home. According to the Secretary, "the majority of the surveys performed at Hainkel Home were initiated via complaints submitted to HSS, and DHH is required, by law, to investigate these complaints."[21] In fact, federal and state law require DHH to investigate every complaint. It was in

---

[18]   Rec. Doc. 33 at p. 8 (internal citations omitted).

[19]   *Id.* at pp. 9-10.

[20]   Rec. Doc. 1 at ¶ 17.

[21]   *Id.*

these surveys that the alleged deficiencies were discovered; these deficiencies were outlined in the June 26, 2012 letter.[22] Specifically, The letter cited Hainkel Home for multiple violations of state regulations under LAC 48:I, Chapter 97, LAC 48:I, Chapter 98, and LAC 48:I, Chapter 99 with regard to the following subchapters: Organization and General Services, Resident Rights, Nursing Services, Dieteric Services, Pharmaceutical Services, Resident Clinical Records, Social Services, Rehabilitation Services, Resident Clinical Records, Physical Environment, Infection Control and Sanitation.[23] Two of the surveys conducted by DHH of Hainkel Home's facility made findings that some residents were in Immediate Jeopardy ("IJ"), one of the most serious designations for a deficiency.[24] Upon these findings, the Secretary claims that "Hainkel Home has continually been in and out of compliance with the minimum licensing standards [La. R.S. 40:2009.6], rules and regulations promulgated by DHH," and therefore the Secretary is authorized under La. R.S. 40:2009.7 to revoke Hainkel Home's license.[25] The letter notifying Hainkel Home of the license revocation, attached to Hainkel Home's verified complaint, outlined several options for Hainkel Home to appeal this determination; first, Hainkel Home was given the opportunity for an "Administrative Reconsideration" ("AR"), and instructed that if Hainkel Home wished to pursue this option to send a written request to a specific address to be received within ten days from receipt

---

[22]  Rec. Doc. 1-2.

[23]  *See id.* at pp. 6-7.

[24]  Rec. Doc. 33 at p. 2. One of the IJ deficiencies entailed a resident receiving second degree burns from hot water. The other involved an employee of Hainkel Home extorting $800 from a resident. Tr. R. p. 22. All outstanding deficiencies, including the IJ deficiencies, were cleared by the time of the preliminary injunction hearing. Rec. Doc. 71 at pp. 32-33.

[25]  Rec. Doc. 33 at pp. 10-11.

of this letter.[26] The letter continued "you also have the right to an Administrative Appeal regarding this situation."[27] The letter then instructed Hainkel Home to send a letter directly to Secretary Greenstein and a copy to the Division of Administrative Law "within thirty (30) days of receipt of the results of the Administrative Reconsideration."[28]

On July 6, 2012, Hainkel Home sent a letter to the address designated for AR hearings and requested that "the following tags be identified for review by the IDR [Informal Dispute Resolution] committee."[29] The AR was delayed during "ongoing discussions by the parties." However, on September 11, 2012, DHH notified Hainkel Home that the AR had been scheduled for September 27, 2012.[30] Hainkel Home alleges in this case that the Secretary has violated procedural due process in seeking to revoke Hainkel Home's nursing home license.  The Secretary maintains that it is following the _administrative appeal procedure set forth in La. R.S.  2009.7 and, in fact, the Secretary later stipulated that the license revocation is suspended pending all administrative and judicial appeals of the license.[31]

### 2. Medicaid Provider Agreement Termination

On September 7, 2012, DHH sent another letter to Hainkel Home to inform the facility that the Secretary was exercising his right to terminate Hainkel Home's Medicaid provider agreement,

---

[26]  Rec. Doc. 1-2 at p. 8.

[27]  *Id.* at p. 9.

[28]  *Id.*

[29]  Rec. Doc. 1-4 at p. 1.

[30]  Rec. Doc. 33.

[31]  Rec. Doc. 37.

effective September 28, 2012. This letter, signed by Undersecretary Phillips, explains that the termination of the Medicaid provider agreement is based upon the earlier decision to terminate the nursing home license, and effected pursuant to Secretary Greenstein's authority under La. R.S. 46:437.11(D)(2), which permits the Secretary to "terminate a provider agreement immediately and without written notice if a health care provider is the subject of a sanction or of a criminal, civil, or departmental proceeding."[32] The Secretary later explained that the license revocation action is a "departmental proceeding."[33] The letter further informed Hainkel Home that it would be entitled to an "administrative review of this action," or an informal review; Hainkel Home opted for an informal review, which at the time of the verified complaint had not been set for hearing.[34] By a letter dated September 10, 2012, DHH notified Hainkel Home that due to the Notice of Termination of Medicaid Provider Agreement, Hainkel Home would have to conduct a resident meeting to inform the residents of the imminent provider agreement termination.[35]

Hainkel Home alleges that the Secretary has violated its procedural due process rights in seeking to revoke Hainkel Home's nursing home license because it is not receiving a suspensive appeal on the license revocation action and further its Medicaid provider agreement is being terminated based upon the pending license revocation action, without affording Hainkel Home all process it is due under Louisiana law. The Secretary maintains that Hainkel Home cannot demonstrate that it has the requisite protected property interest necessary to assert a procedural due

---

[32]  Rec. Doc. 1 at ¶¶ 30-31; Rec. Doc. 33 at p. 2; Rec. Doc. 1-5 (termination letter).

[33]  Rec. Doc. 62 at p. 4 ("The license revocation is a **departmental proceeding** under which the Secretary may move.")(emphasis in original).

[34]  Rec. Doc. 1 at ¶¶ 32-34.

[35]  Rec. Doc. 33 at p. 3.

process right regarding the Medicaid provider agreement. The Secretary avers that because Hainkel Home has no property interest in the Medicaid provider agreement, it has no right to procedural process.

### D. Procedural History

#### 1. Temporary Restraining Order and Preliminary Injunction

On September 18, 2012, Hainkel Home filed a verified complaint and motions for a temporary restraining order ("TRO") and preliminary injunction, asserting violations of its procedural due process and substantive due process rights.[36] Hainkel Home claimed that Secretary Greenstein denied Hainkel Home the proper appellate procedure as required by law to challenge the revocation of its nursing home license and then, before it could get a review of the decision to revoke its nursing home license that Hainkel Home alleges it was entitled to by law, and which should have been suspended during the administrative and judicial appeals process, the Secretary used the license revocation as the sole basis for the termination of the Medicaid provider agreement.[37] Hainkel Home alleged that "the state seeks to immediately revoke Hainkel Home's provider agreement on the conclusion that Hainkel Home's license has been revoked. Hainkel Home's license has not been revoked, and will not be revoked unless and until it has exhausted all of its appeals."[38]

Hainkel Home's immediate concern in its request for a temporary restraining order was a meeting the Secretary would require Hainkel Home to conduct on either September 17, 18, or 19,

---

[36]  Rec. Docs. 1, 2.

[37]  Rec. Doc. 1 at ¶ 37; *See also* Rec. Doc. 2-1 at p. 10.

[38]  Rec. Doc. 2-1 at p. 10.

wherein, Hainkel Home would have to notify its residents that: "(a) the Medicaid Provider Agreement was terminated; (b) Hainkel Home's funding would be cut off; and (c) the residents would be forced to relocate to other facilities."[39] Hainkel Home maintained that having such a meeting, especially before exhaustion of all its appeals in  the nursing home license revocation action, would have a significant financial impact on it, and in fact, force it out of business.[40]

### 2. Stipulations of the Parties

During a telephone call with the parties on September 19, 2012, upon the motion for a TRO, the parties stipulated to a number of issues eliminating the need for a TRO. It was agreed that the resident meeting would be continued until after the Court issued a ruling on the preliminary injunction. Additionally, the Secretary agreed that Hainkel Home's appeal of its nursing home license revocation was suspensive, and therefore would not be effective until after all administrative reviews and judicial appeals had been exhausted.[41] As such, any fear of immediate irreparable harm was mooted, removing the need for a TRO. The Court set the hearing for the preliminary injunction on October 12, 2012, at 10:00 AM.[42]

### 3. Motion to Dismiss

Before a hearing on the preliminary injunction could be had, the Secretary filed a Motion to Dismiss on October 4, 2012, which was initially set for hearing on October 24, 2012; however, the Court granted a motion to expedite hearing, and heard the motion on October 12, 2012, at 9:00 AM.

---

[39] Rec. Doc. 1 at ¶ 38.

[40] *See id.* at ¶¶ 40-47.

[41] Rec. Doc. 7.

[42] Rec. Doc. 37.

In this motion, Secretary Greenstein challenged the Court's subject matter jurisdiction over Hainkel Home's claim relating to the license revocation action on the basis that "the allegation concerning the License Revocation Action contain[s] no allegation of federal law" and Hainkel Home must exhaust all state law administrative remedies before this Court has subject matter jurisdiction.[43]  The Secretary also challenged this Court's subject matter jurisdiction with respect to Hainkel Home's claims relating to the termination of the Medicaid provider agreement. Specifically, the Secretary averred that Hainkel Home in "pleading the substance of the license revocation and provider agreement action throughout its Complaint and in memoranda submitted to this Court," defeated its own argument that its procedural due process claim falls under the "entirely collateral exception" to the requirement that it exhaust all its administrative remedies prior to judicial review. In the alternative, the Secretary claimed that Hainkel Home had failed to state a claim upon which relief could be granted in relation to the termination of the Medicaid provider agreement, because Hainkel Home did not have a protectable property right in the Medicaid provider agreement.

Hainkel Home filed an opposition on October 10, 2012,[44] wherein it claimed that the Court had subject matter jurisdiction over this dispute under 42 U.S.C. § 1983, 28 U.S.C. § 1343(a)(3), and 28 U.S.C. § 1331. Moreover, Hainkel Home averred that it asserted a wholly collateral attack on the Secretary's actions, thereby meeting an exception to the exhaustion requirement and providing this Court subject matter jurisdiction over the nursing home license revocation and Medicaid provider agreement termination actions. Hainkel Home claimed a property interest in the Medicaid provider agreement and "as a party to a lease with the State through DHH for the property the facility is

---

[43]  Rec. Doc. 17-1 at pp. 8, 20.

[44]  Rec. Doc. 40.

located."[45] Hainkel Home argued that by the terms of the lease and the statute authorizing the state

to enter into the lease with Hainkel Home, failure to operate as a nursing home would result in

termination of the lease. If the Medicaid provider agreement was terminated, Hainkel Home would

not have sufficient funds to continue to operate as a nursing home and would therefore force

termination of the lease.[46]

The Court determined, for the reasons stated on the record on October 12, 2012, that it had

jurisdiction over Hainkel Home's claim because the procedure utilized by the Secretary to effectuate

a termination of Hainkel Home's Medicaid provider agreement would be constitutionally inadequate

(at least from the allegations made in Hainkel Home's complaint) because the termination would

force Hainkel Home to incur a devastating loss before the nursing home can access the appeals

procedure.[47] The Court determined that procedural due process issues appear to be matters that are

wholly collateral to the underlying determination of the correctness of the license revocation or

Medicaid provider termination, and Hainkel Home's interest in having a determination of a decision

by the Secretary of DHH makes deference to the administrative decision inappropriate here.

Regarding the Secretary's claim that Hainkel Home's allegations as to the termination of the

Medicaid provider agreement action failed to state a claim upon which relief can be granted and thus

should be summarily dismissed with prejudice, the Court deferred ruling and requested additional

briefing considering there appears to be no controlling precedent to guide this Court on the issue of

---

[45] *Id.* at pp. 16-20.

[46] *Id.*

[47] *See Taylor v. U.S. Treasury Dept.*, 127 F.3d 470, 477 (5th Cir. 1997) (recognizing an exception to the exhaustion requirement when "the unexhausted administrative remedy would be plainly inadequate").

whether a Medicaid provider has a protectable property interest in a Medicaid provider agreement to implicate a colorable claim for procedural due process.

## II. Subject Matter Jurisdiction and Failure to State a Claim

### A. Subject Matter Jurisdiction

Before proceeding to the substantive issue of the preliminary injunction, the Court will revisit the question of subject matter jurisdiction with regard to the claims relating to the termination of the Medicaid provider agreement. The Court finds sufficient evidence was offered to support and affirm the Court's prior ruling, made on the record, that Hainkel Home's claims meet the requirement of the "entirely collateral" exception to the exhaustion of administrative remedies prerequisite to confer subject matter jurisdiction upon this Court. However, regarding whether there is a protectable property right in the Medicaid provider agreement, a question of first impression for this Court, for the reasons explained below, the Court need not resolve that issue in this case.[48]

### B. Failure To State a Claim

#### 1. Property Interest at Issue

Concerning Hainkel Home's procedural due process claim, Secretary Greenstein argues that Hainkel Home does not have "a property interest in its Medicaid Provider Agreement that gives rise to a right to procedural due process."[49] Secretary Greenstein argues that "federal courts have consistently held that no protected property rights are implicated when States take various actions

---

[48] *See infra* Part II.B.2.

[49] Rec. Doc. 17-1 at p. 13.

which may be adverse to Medicaid providers."[50] Specifically, Secretary Greenstein cites *Plaza Health Laboratories, Inc. v. Perales*,[51] wherein the United States Court of Appeals for the Second Circuit stated:

> The combination of rights reserved by the State with regard to Medicaid providers, allowing DSS to terminate without cause on the 30 days' notice or to terminate or suspend immediately in certain circumstances, casts doubt on whether the provider's interest in continuing as a provider, either indefinitely or for any period without interruption, is a property right that is protected by due process.[52]

Greenstein rejects that "the income stream from Louisiana Medicaid that will cease with the termination of the Medicaid provider agreement" is a property right, and asserts that this idea has been flatly rejected by other circuits.[53]

In addition, Greenstein cites *Geriatrics, Inc. v. Harris*,[54] from the United States Court of Appeals for the Tenth Circuit, to support his contention that nursing homes are not entitled to a preliminary injunction prior to a hearing on whether the facility is in compliance with state and federal regulations.[55] Greenstein argues that the Tenth Circuit reasoned that a nursing home had no protectable property interest because it is not the "intended beneficiary of the Medicaid Program" and that the court was unpersuaded by claims that termination of the provider agreement would

---

[50] *Id.* at pp. 13-14 (citing numerous cases from the Second, Eighth, and Tenth Circuits).

[51] 878 F.2d 577 (2d Cir. 1989).

[52] *Id.* at 582.

[53] Rec. Doc. 17-1 at p. 15.

[54] 640 F.2d 262 (10th Cir. 1981).

[55] Rec. Doc. 17-1 at p. 15.

hasten the closing of the nursing home.[56] Therefore, Greenstein again claims that Hainkel Home has failed to state a claim upon which relief can be granted.

In opposition, Hainkel Home disregards most of the cases cited by Greenstein on the basis that they "have no precedential value, are dated and/or outside the jurisdiction of the U.S. Fifth Circuit."[57] Additionally, Hainkel Home asserts a property interest in the Medicare provider agreement.

Hainkel Home distinguishes *Plaza Health Laboratories*, claiming that it is "based on New York law."[58] Furthermore, Hainkel Home similarly claims that Greenstein's reliance on *Geriatrics* is misplaced because that case involved "the nonrenewal of a provider agreement after it expired (after the property interest was lost), and not the termination of a provider agreement during the term of the agreement."[59]

Hainkel Home rejects Greenstein's contention that it has failed to state a claim for which relief may be granted. It points to the *Ridgeview Manor of the Midlands, L.P. v. Leavitt,*[60] *Oak Park Health Care Center, LLC v. Johnson,*[61] and *D & W Health Services, Inc. v. Sebelius*,[62] decisions where "each found that a preliminary injunction enjoining the termination of a provider agreement

---

[56] *Id.* at pp. 15-16.

[57] Rec. Doc. 40 at p. 1.

[58] *Id.* at p. 19.

[59] *Id.*

[60] No. 07-861, 2007 WL 1110915 (D.S.C. Apr. 9, 2007).

[61] No. 09-217, 2009 WL 331563 (W.D. La. Feb. 10, 2009).

[62] No. 10-316, 2011 WL 2552522 (M.D. La. Jun. 27, 2011).

prior to a termination hearing was proper."[63] In post-hearing briefing, Hainkel Home further attempts to distinguish the cases cited by Greenstein, claiming that those cases dealt with "without cause" terminations, whereas here the Secretary sought a "for cause" termination of its provider agreement.[64] Instead, Hainkel Home urges that this Court rely on the previously mentioned district court cases where "each implicitly held that a nursing home has a property interest in the Medicaid provider agreement."[65]

Hainkel Home argues that DHH and the Secretary are depriving it of its due process rights by basing the termination of the provider agreement solely on the decision to revoke its nursing home license.[66] Specifically, Hainkel Home avers that here the termination of the provider agreement pursuant to authority under La. R.S. 46:437.11, the Medical Assistance Programs Integrity Law ("MAPIL"), is an invalid exercise of power, because the basis is the license revocation, instead of the grounds as set forth in MAPIL. Hainkel Home contends that MAPIL's sanctions are only aimed to combat "fraud and abuse," and cannot be used to punish licensing deficiencies.[67]

Hainkel Home further points out that MAPIL defines "substandard care" in relation to medical malpractice, proof of which must be substantiated by an expert witness who can "establish the standard of care, a breach in the standard of care and damages to the patient that would not have

---

[63] Rec Doc. 40 at p. 21.

[64] Rec. Doc. 71 at pp. 19-20.

[65] *Id.* at p. 20.

[66] *Id.* at p. 9.

[67] *Id.* at pp. 9-10.

19

occurred in the absence of the medical negligence."[68] Hainkel Home asserts that a medical negligence claim must be related to medical treatment, not simply any license deficiency.[69] Therefore, Hainkel Home argues that the legislature made clear that MAPIL's sanctions may not be imposed for "licensing violations" and if MAPIL could be used in such a way it "would allow the Secretary to void suspensive appeal rights of any Medicaid provider who has <u>any</u> ongoing dispute with the DHH- no matter how minor– by immediately terminating a license and using that immediate termination as grounds for terminating a provider agreement."[70]

Hainkel Home argues that it "has never been notified of a sanction or proceeding," and "never been apprised by DHH of a violation or potential violation of the Medicaid Integrity Act."[71] In addition, Hainkel Home states that they were not given thirty days' notice based upon when Hainkel Home received the termination letter and the effective date set forth therein, which is necessary if the termination is without cause. Moreover, Hainkel Home avers that the Secretary misuses the "for cause" revocation procedure, applying it to situations where "there is no need for termination, without notice to the Facility," and points out that Hainkel Home's provider agreement termination was given with notice and was not immediate.[72] Hainkel Home maintains that such an exercise of MAPIL "allows the Secretary to effectively and indiscriminately eliminate the appeals

---

[68]  *Id.* at p. 11.

[69]  *Id.* (citing *Coleman v. Deno*, 01-1517 (La. 01/25/02); 813 So.2d 303, 315-16).

[70]  *Id.* at p. 12 (emphasis in original).

[71]  Rec. Doc. 2-1 at p. 11.

[72]  *Id.* at pp. 12-13.

procedure for any home with a deficiency as a result of an annual or complaint survey under the Licensing Standards."[73]

Hainkel Home references the Secretary's own testimony, where he conceded that Hainkel Home's pending termination is not premised on fraud or abuse.[74] As such, Hainkel Home argues it may not be sanctioned under MAPIL. Moreover, Hainkel Home claims that because the Secretary has stipulated that Hainkel Home will receive a suspensive appeal regarding its nursing home license revocation action, the use of the license revocation as the basis for the provider agreement termination is "premature."[75]

In opposition, the Secretary emphasizes that under MAPIL the Secretary may terminate a provider agreement "immediately and without written notice if a health care provider is the subject of a sanction of a criminal, civil, or departmental proceeding."[76] The Secretary argues that the license revocation is a departmental proceeding, thus allowing the Secretary to take action under MAPIL with regard to the provider agreement.  The Secretary describes the provider agreement as an "at-will" relationship, whereby even without cause, the law allows termination by either party upon thirty days' notice.[77] The Secretary maintains that when Hainkel Home entered into the provider agreement, it enrolled in the Louisiana Medicaid Program "and agreed to the rules pursuant

---

[73]   *Id.* at p. 12.

[74]   *Id.* at p. 13 (citing Tr. R. pp. 345-46, 362).

[75]   *Id.*

[76]   Rec. Doc. 62 at p. 4.

[77]   *Id.* at pp. 4-5.

thereto... Moreover, Hainkel Home cannot now plead a lack of notice or ignorance of the MAPIL statute and the authority it affords the Secretary."[78]

### 2. Analysis of Property Interest at Issue

Throughout these proceedings, Greenstein has maintained that Hainkel Home does not have a protectable property interest in the Medicaid provider agreement, and therefore has failed to state a claim upon which relief can be granted for procedural due process. While both parties cite authority to support their positions, neither party points to controlling precedent directly on this issue. However, Supreme Court precedent outlining the requirements to establish a protectable property interest to support a claim for procedural due process lends the Court guidance on this issue for this circuit. Moreover, other circuits that have squarely addressed this specific issue provide persuasive authority.

In *Perry v. Sindermann*,[79] the United States Supreme Court stated that, "a person's property interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutuality or explicit understandings that support his claim of entitlement to the benefit and that he may invoke a hearing."[80] In *Board of Regents of State Colleges v. Roth*,[81] the Supreme Court discussed in great depth what constitutes a protectable property right in the context of a procedural due process claim: "To have a property interest in a benefit, a person clearly must have more than

---

[78]  *Id.* at p. 5.

[79]  408 U.S. 593 (1972).

[80]  *Id.* at 601.

[81]  408 U.S. 564 (1972).

an abstract need or desire for it. He must have more than a unilateral expectation of it."[82] Property interests "stem from an independent source such as state law-rules or understanding that secure benefits and that support claims of entitlement to those benefits."[83]

In *Roth*, an assistant professor of a state university, who had no tenure rights to continued employment, sought redress after he was informed he would not be rehired for the next academic year, claiming that his Fourteenth Amendment rights were violated. In analyzing whether the plaintiff had a protectable property interest, the United States Supreme Court recognized that it previously found a protectable property interest for eligible welfare beneficiaries because "state law-rules or understandings [] secure[d] certain benefits[] and support[ed] claims of entitlement to those benefits."[84]

In finding that the assistant professor did not have a property interest, the Supreme Court noted:

> [The ] terms [of the plaintiff's employment] secured his interest in employment up to June 30, 1969. But the important fact in this case is that they specifically provided that [the plaintiff's] employment was to terminate on June 30. They did not provide for contract renewal absent "sufficient case." [] Thus, the terms of [the plaintiff's] appointment secured absolutely no interest in re-employment for the next year.[85]

In *Plaza Health Laboratories v. Perales*,[86] relied upon by Greenstein, the Second Circuit affirmed the district court's denial of a preliminary injunction. There, the New York state agency

---

[82]  *Id.* at 577.

[83]  *Id.*

[84]  *Id.*

[85]  *Id.* at 578.

[86]  878 F.2d 577 (2d Cir. 1989).

tasked with regulating nursing homes notified Plaza that it was to be suspended from participation in the Medicaid program.[87] Plaza filed for injunctive relief to enjoin the state from terminating or suspending its participation as a Medicaid provider, claiming that the state agency "gave Plaza no meaningful notice or opportunity to be heard and thus violated Plaza's due process rights."[88] The district court found that the "interest does not rise to the level of a constitutionally protected property interest."[89]

On review, the United States Court of Appeals for the Second Circuit made clear that it only reviewed the denial of a preliminary injunction for abuse of discretion.[90] Applying this deferential standard, the Second Circuit did not unambiguously accept the district court's determination that participation as a Medicaid Provider was not a protectable right, but rather acknowledged that, "it may well be that a person's interest in uninterrupted continuation as a Medicaid Provider is not a property right that is protected by due process," and recognized that "in the Medicaid context, we have not had occasion to rule dispositively on the question of whether the provider of services had a property right, under then-applicable state regulatory scheme, to continue to participate in the program."[91]

However, citing Supreme Court precedent, the Second Circuit stated that "where state provisions bestow a right that cannot properly be eliminated except for cause, that right constitutes property protected by procedural due process, [but where] the existence of provisions that retain for

---

[87] *Id.* at 578.

[88] *Id.* at 579.

[89] *Id.* at 580.

[90] *Id.* at 581.

[91] *Id* at 582.

the state significant discretionary authority over the bestowal or continuation of a government benefit suggests that the recipients of such benefits have no entitlement to them"[92] Applicable New York law allowed for termination of a provider's participation without cause, if it is afforded thirty days' notice. As such, the Second Circuit found the district court did not abuse its discretion in denying the preliminary injunction upon a finding that there was no protectable property interest.[93]

As outlined previously, Louisiana Revised Statute § 46:437.11(D)(1), or MAPIL, states, "Unless the provider agreement is terminated by the Secretary for cause as provided in Paragraph (2) of this Subsection, a health care provider agreement shall be effective for a stipulated period of time, shall be terminable by either party thirty days after receipt of written notice, and shall be renewable by mutual agreement. While the *Plaza Health Laboratories* court analyzed this issue with regard to New York's Medicaid law, it was these same aspects, termination without cause and no entitlement to continue as a provider, that led the Second Circuit to believe no property right existed in the Medicaid provider agreement.[94] Under the applicable Louisiana law, the existence of a *secured* right or entitlement in the Medicaid provider agreement is doubtful. However, based upon the actions and stipulations of the parties, in this particular matter and for the reasons explained below, the Court does not have to resolve this issue to arrive at a decision in this case, as a determination of this issue is not necessary to the ultimate outcome of this case.

---

[92] *Id.* at 581 (citing *Perry*, 408 U.S. at 600-01).

[93] *Id.* at 582.

[94] 878 F.2d at 582.

As noted above, the Medical Assistance Programs Integrity Law,[95] or MAPIL, allows for the termination of Medicaid provider agreements with or without cause. The Secretary states that it terminated Hainkel Home's Medicaid provider agreement for cause - namely, based upon the revocation of the nursing home license. Under Section (D)(2), the Secretary may terminate a provider agreement for cause, "immediately and without written notice if a health care provider is the subject of a sanction or of a criminal, civil, or departmental proceeding."[96]

Section 437.2, entitled "Legislative intent and purpose," outlines the scope of MAPIL and sheds light on the types of violations the "for cause" provision of Section 437.11 is meant to safeguard against. MAPIL was "enacted to combat and prevent fraud and abuse committed by some health care providers" and gives the state the "ability, authority, and resources to pursue civil monetary penalties, liquidated damages, or other remedies to protect the fiscal and programmatic integrity of the medical assistance programs from health care providers and other persons who engage in fraud, misrepresentation, abuse, or other ill practices, as set forth in this Part, to obtain payments to which these health care providers or persons are not entitled."[97] Relevant here, Section 437.14(A)(10), entitled "Grounds for denial or revocation of enrollment," specifically lists a "violation of licensing or certification conditions or professional standards relating to the licensure or certification of health care providers or the required quality of goods, services, or supplies provided," as grounds for revocation of a provider agreement.

---

[95]   La. R.S. 46:437.11.

[96]   La. R.S. 46:437.11(D)(2).

[97]   La. R.S. 46:437.2(A)-(B).

MAPIL also allows for termination of a Medicaid provider agreement without cause. Section (D)(1) states that "a health care provider agreement shall be effective for a stipulated period of time, shall be terminable by either party thirty days after receipt of written notice, and shall be renewable by mutual agreement." Therefore, under this provision, the Secretary may terminate a provider agreement *without cause* provided he gives thirty days' notice.

The Court takes note that Hainkel Home maintains that based upon the expressly articulated purpose of Section 437, and its focus on "fraud, misrepresentation, abuse, or other ill practices," the alleged violations of Hainkel Home fall outside the purview of allowable "for cause" terminations of provider agreements. However, this theory is undercut by Section 437.14(A)(10), which states that a violation of nursing home license certification conditions is grounds for revocation of enrollment in the medical assistance program.

Nevertheless, it is this Court's finding that the Secretary's reliance on the suspended license revocation as a basis for the termination of the provider agreement is improper. The Secretary has continually asserted the license revocation as the basis for the Medicaid provider agreement termination.[98] However, the Secretary has stipulated that the license revocation is suspended pending all appeals of that decision.[99] "A suspensive appeal, by its very nature, suspends the execution of a [...] judgment" or decision.[100] The Louisiana Supreme Court has recognized that "[t]he effect of a suspensive appeal is to stay execution and all further proceedings until definitive judgment be

---

[98]   Rec. Doc. 33 at pp. 2-3 ("The termination of the Medicaid Provider Agreement was based on the Secretary of DHH's authority under La. R.S. 46:437.11(D)(2)... [T]he Secretary utilized this authority to terminate Hainkel Home's Medicaid Provider Agreement, based on the underlying license revocation action.").

[99]   Rec. Doc. 37.

[100]   *Fontenot v. Dept. of Pub. Safety and Corrections, Office of Motor Vehicles*, 625 So.2d 1122, 1124 (La. 1 Cir. 1993); La. C.C. art. 2123.

rendered on appeal. It is therefore our clear duty to maintain the status quo until this appeal can be reached in due course by this court."[101] Therefore, there is legal support for, but more important in this case it was stipulated to by the Secretary, that during the appeals process, the effect of the license revocation is "suspended," and the license is not truly revoked until the exhaustion of all appeals. As such, it is not only fundamentally unfair to use this as the basis for a "for-cause" termination, but also legally untenable.

The Court further finds that using the suspended license revocation as the basis for terminating the Medicaid provider agreement, the Secretary violated Hainkel Home's right to maintain the "status quo" during the period of its appeal, and violated Hainkel Home's substantive due process rights. Although Hainkel Home may not have a property interest in the Medicaid provider agreement, it is undisputed that it does have a property interest in the nursing home license, which is implicated in the for cause termination under MAPIL.

Even though the Secretary has stated that DHH terminated the Medicaid provider agreement for cause, all acknowledge that MAPIL also allows the termination of a provider agreement without cause, however a party must give thirty days' notice. While DHH expressly stated that the termination of Hainkel Home's Medicaid provider agreement was premised on "cause," the Court also notes that DHH nonetheless would have failed to meet the statutory requirements of a without-cause termination as well. The Secretary sent notice dated September 7, 2012, notifying Hainkel Home of its intention to terminate its provider agreement based upon the June 26, 2012 license revocation notice.[102] Yet the letter informed Hainkel Home that the provider agreement would not

---

[101] *Zahn v. Unknown Owners*, 98 So. 184, 185 (La. 1923).

[102] Rec. Doc. 1-5 at p. 2.

be terminated immediately, but rather on September 28, 2012, only *twenty-one* (21) days after the issuance of the letter.[103] Therefore, this Court finds that not only did the Secretary impermissibly use the for-cause authority under MAPIL, it also failed to comply with the without-cause provisions of MAPIL. DHH undeniably failed to provide the statutorily required thirty days' notice to terminate the provider agreement without cause. Nevertheless, termination without cause is not an issue here, because the Secretary has maintained that the termination of the Medicaid provider agreement was for cause - the cause being the action taken regarding the nursing home license revocation.

The Court's findings here do not depend on whether this Court concludes that Hainkel Home has a protectable property interest in the Medicaid provider agreement. In this instance, to terminate the provider agreement based upon the revocation of a nursing home license - the effect of which is suspended according to the Secretary's own stipulations- would render the suspensive appeal on the licensing revocation action meaningless because Hainkel Home would be out of business before it could fully challenge the nursing home license revocation and therefore would deny Hainkel Home its procedural due process rights of review of the nursing home license revocation. The Secretary has never argued that Hainkel Home does not have a property interest in the nursing home license. Due process ensures "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"[104] Allowing the use of the license revocation action as the basis for the Medicaid provider agreement termination, would render Hainkel Home's suspensive appeal on the nursing home license purely academic.

---

[103] *Id.*

[104] *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

Moreover, Hainkel Home has identified a clear property right in the lease agreement of the facility, which would terminate upon the cessation of the facility's operation as a nursing home. Yet the lease, by its express terms, grants a party an opportunity to cure any defects within thirty days to avoid early termination.[105] This opportunity to cure is a procedural due process right that is triggered by termination of the Medicaid provider agreement because such termination will run Hainkel Home out of the nursing home business; if Hainkel Home is no longer in the nursing home business, the lease may be terminated. Accordingly, the opportunity to cure the lease issue would be denied if Hainkel Home were not afforded a chance to appeal the nursing home license revocation prior to termination of the Medicaid provider agreement considering that termination was based on the suspended nursing home licence revocation.

The Secretary's only response to this alleged property right in the lease and its connection to the Medicaid provider agreement and nursing home license revocation is that it was not initially pled in the complaint. However, Federal Rule of Civil Procedure 15(b) states that, "A party may move--at any time, even after judgment--to amend the pleadings to conform them to the evidence and to raise an unpleaded issue."  Hainkel Home first raised the theory of the lease as a property interest in opposition to the motion to dismiss and evidence of the lease was presented at trial. The Court finds that consideration of the lease does not prejudice the Secretary or DHH and in the interest of fairness and justice it should be considered here.[106] Moreover, after the hearing, the

---

[105]  Rec. Doc. 40-7 at p. 6.

[106]  *See Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 597 (Former 5th Cir. Nov. 5, 1981) ("Appellate review of the decision to grant or deny leave is generally described as limited to 'determining whether the trial court abused its discretion.'"). This Court also notes that leave to amend "should be freely given when justice so requires,' and that there is "a bias in favor of granting leave to amend." *See id.*

magistrate judge allowed Hainkel Home to file an amended complaint that includes the argument outlined above.[107]

Secretary Greenstein's testimony evidences that the Secretary felt that Hainkel Home, as a provider, was forced on the department by the legislature.[108] The Secretary "would have preferred an arrangement that would have been more competitive, where [DHH] would have had multiple bidders."[109] After the surveys conducted on Hainkel Home revealed deficiencies, the Secretary saw an opportunity to choose who DHH would do business with and who they would pay money to through Medicaid.[110] They then used the nursing home license revocation as the basis to terminate the Medicaid provider agreement -- which predictably would run Hainkel Home out of the nursing home business. The lease between DHH and Hainkel Home is premised on Hainkel Home being a nursing home provider. The Secretary knew of Hainkel Home's dependance on Medicaid funding, and could have easily predicted that termination of the Medicaid provider agreement would run Hainkel Home out of business before it could exhaust its appeals on the nursing home license revocation. Once Hainkel Home was no longer a nursing home operator, DHH could be released of its lease obligations with Hainkel Home.

However, as stipulated by the Secretary, the nursing home license revocation is suspended pending review. Therefore, it was improper for the Secretary to use the nursing home license

---

[107]  Rec. Doc. 75.

[108]   Tr. R. p. 337 (Greenstein: I mean, it's not a regular privatization with a competitive RFP [request for proposals] and weighing the benefits of multiple private groups looking to provide that service. Instead, this was very directed from the legislature with one organization).

[109]   Tr. R. p. 338.

[110]  Tr. R. p. 366 (Greenstein: One piece is the regulatory scheme of that allows an organization to do business with multiple business partners, with private individuals, community organizers, with Medicare. The other decision is whom we do business with. We have identified [Hainkel Home] as not being a good business partner.).

revocation as a "departmental proceeding" under which it could terminate Hainkel Home's Medicaid provider agreement under MAPIL. Accordingly, although appearing to be separate actions taken by the Secretary on its face, all of the actions were necessary for the Secretary to end its business relationship with Hainkel Home and are tied to its initial decision to revoke Hainkel Home's nursing home license. And so, if Hainkel Home is not provided the full effect of suspension of the nursing home license revocation action, it loses all other rights and privileges connected to its status as a nursing home operator before that decision becomes final or effective. The Secretary's proposed actions regarding the Medicaid provider agreement would render Hainkel Home's suspensive appeal of the nursing home license revocation a token offering, providing Hainkel Home with none of the protections a suspensive appeal is meant to preserve, and making the ultimate determination on the nursing home license revocation action moot, as Hainkel Home would already be out of business.

For all the reasons stated above, Hainkel Home has stated a claim upon which relief can be granted in that all of the Secretary's actions are tied to the initial revocation of Hainkel Home's nursing home license - a property interest not in dispute.

### III. Preliminary Injunction

Federal Rule of Civil Procedure 65 allows a district court to issue a preliminary injunction upon notice to the adverse party. A plaintiff must establish four elements to secure a preliminary injunction: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction

will not disserve the public interest.[111] A district court's factual findings as to each element is reviewed under a clearly erroneous standard, while any legal findings are reviewed de novo.[112]

### A. Substantial Likelihood of Success on the Merits

*1. Parties' Arguments*[113]

Hainkel Home argues that it has demonstrated a likelihood of success on the merits of its procedural due process claim because "the loss of the lease, the loss of its business, and the loss of the Medicaid provider agreement constitute a grievous loss prior to the opportunity to be heard at a meaningful time and in a meaningful way," as a result of the Secretary using its nursing home license revocation, while that decision was suspended, as the basis for the termination of its Medicaid provider agreement.[114]

Hainkel Home further argues that there are insufficient grounds to revoke the license and provider agreement, based on the testimony of DHH surveyor Matthew Thibodeaux and Dr. Lutz. Moreover, Hainkel Home avers that LAC tit. 40:I:9737 provides that the Secretary shall only impose

---

[111]  *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011).

[112]  *Id.* at 591-92.

[113]  The Court summarizes the arguments that have already been outlined and analyzed in detail above.

[114]  Rec. Doc. 71 at p. 15.

a penalty that would bring a home into compliance, and that therefore revocation of the license and termination of the provider agreement is arbitrary and capricious.[115]

In opposition to the preliminary injunction, the Secretary claims that Hainkel Home has failed to demonstrate a likelihood of success on the merits because it cannot demonstrate that it has been denied due process.[116] The Secretary argues that the he simply exercised his authority under MAPIL to terminate the provider agreement for cause after the license revocation, a departmental proceeding "under which the Secretary may move."[117]

Further, the Secretary rejects the charge that the Secretary's actions were arbitrary and capricious, but rather based upon Hainkel Home's "cyclical non-compliance."[118] The Secretary rejects strict comparisons to other homes and actions taken by the Secretary in the past, emphasizing DHH's new stance that "Enough is Enough. It's Time to get Tough." "The fact that Hainkel Home may be one of the first nursing home [sic] to face consequences of this aggressive approach may be unfortunate, but it is necessary-----someone MUST BE FIRST."[119]

*2. Analysis*

In determining that this Court has subject matter jurisdiction and that Hainkel Home has stated a claim upon which relief may be granted, the Court has already addressed many of the

---

[115] *Id.* at pp. 26-28.

[116] Rec. Doc. 62 at p. 3.

[117] *Id.* at p. 4.

[118] Tr. R.  pp. 334-35 (A: It was not a sense that the gravity of the situation or the seriousness of the issues were seen from the home's perspective the same way that DHH saw them. We were moving down a road again that we refer to as cyclical noncompliance: multiple termination tracks from the federal government, repeated IJs, repeated surveys, repeated complaints.) (testimony of Secretary Greenstein).

[119] Rec. Doc. 62 at p. 15.

arguments made in relation to this factor.[120] The Secretary has stipulated in this matter that Hainkel Home will receive a suspensive appeal on the termination of the nursing home license. As explained above, the effect and purpose of a suspensive appeal is to maintain the status quo. Moreover, due process ensures the opportunity to be heard in a meaningful manner at a meaningful time. Termination of the Medicaid provider agreement, premised on the suspensive revocation of the nursing home license, would deny Hainkel Home its due process rights in the nursing home license review and appeal. Further, should Hainkel Home go out of business due to the termination of its Medicaid provider agreement, based on the suspended nursing home license revocation, Hainkel Home would be deprived of its rights pursuant to its lease. As such, Hainkel Home has demonstrated a substantial likelihood of success on the merits of its procedural due process claim.

### B. Irreparable Injury

#### 1. Parties' Arguments

Hainkel Home argues it be deprived of its constitutional rights and irreparably harmed without a preliminary injunction because it will be forced out of business before it can exhaust its review and appeal of the nursing home license revocation.[121] In support of its position, Hainkel Home further avers that "as a matter of law, federal courts at all levels have recognized repeatedly that constitutional rights violations constitute irreparable harm,"[122] and it cites the testimony of its Administrator, Robert Rodrigue, who estimated that 98% of Hainkel Home's patients' care is funded through Medicaid, and once this source of payment is terminated, the facility would close the next

---

[120]   *See supra* Part II.

[121]   Rec. Doc. 71 at p. 28.

[122]   *Id.* at p. 29 (quoting *Henderson v. Stalder*, 265 F.Supp.2d 699 (E.D. La. 2000) (Duval, J.)).

35

day.[123] Hainkel Home relies on *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*,[124] which states that irreparable harm in the context of a preliminary injunction "exists where potential economic loss is so great as to threaten the existence of a movant's business."

Hainkel Home also argues that patients will suffer irreparable harm. Hainkel Home references the testimony of Dr. Lutz, who explained the deleterious effects of transfer trauma on patients. Hainkel Home cites a string of cases where transfer trauma is considered relevant to the determination of irreparable harm.[125] Finally, Hainkel Home also emphasizes the effect the Medicaid provider agreement termination would have on its 135 employees who would lose their jobs.[126]

In opposition, the Secretary argues that Hainkel Home's evidence demonstrates that termination of the provider agreement will effect its cash flow, but that irreparable harm is defined as that which cannot be undone through monetary remedies.[127] The Secretary maintains that if Hainkel Home ultimately prevails on its administrative appeal, it may seek monetary compensation for any Medicaid revenue it lost during the administrative appeal process.[128]

Regarding transfer trauma, which could be suffered by Hainkel Home's residents, the Secretary argues that this should not be considered because Hainkel Home is the plaintiff, not the

---

[123]   Tr. R. p. 187 (Q: If the last date Hainkel receives [Medicaid] funding is October 28, 2012, what happens to the Hainkel Home – if it receives its last funding on October 28, what happens to Hainkel Home on October 29, 2012? A: We are essentially out of business.).

[124]   875 F.2d 1174, 1179 (5th Cir. 1989).

[125]   Rec. Doc. 71 at p. 31.

[126]   Tr. R. p. 182 (Q: What impact, if any, would the termination of the Medicaid provider agreement have on Hainkel Home's ability to be a viable business and pay its 135 employees? A: We are primarily a Medicaid operation, and it would shut us down.) (testimony of Robert Rodrigue).

[127]   Rec. Doc. 62 at p. 15 (citing *Deerfield Medical Ctr. v. City of Deerfield Beach*, 661 F.2d 328 (5th Cir. Unit B Nov. 13, 1981)).

[128]   *Id.* at p. 16.

patients.[129] Moreover, the Secretary avers that it will mitigate the effects of any transfer trauma through a "timed, orderly, and monitored move of residents a very short distance."

The Secretary cites *O'Bannon v. Town Court Nursing Center*,[130] wherein the Supreme Court held that Medicaid patients who are forced to move because their nursing home has been decertified do not have a due process claim based upon how the nursing home license was revoked. Finally, the Secretary maintains that no constitutional rights are violated here because Hainkel Home does not have a protectable property interest in the Medicaid provider agreement.

### 2. Analysis

The crux of Hainkel Home's argument is that if the Secretary terminates its Medicaid provider agreement it will go out of business because a substantial percentage of its patients pay for their care through Medicaid reimbursement. In *Atwood*, cited by Hainkel Home, the Fifth Circuit affirmed a district court's grant of a preliminary injunction. In that matter, defendant Petrobras furnished a letter of credit to Atwood as security for services Atwood was to perform. Petrobras then refused to pay Atwood, and in response, Atwood applied for a TRO because the letter of credit was set to expire and would not be redeemable. The district court granted a TRO extending the letter of credit for a brief time in order to leave Atwood's security intact.[131] Thereafter, the district court granted Atwood a preliminary injunction further extending the letter of credit's effective date.

---

[129]   *Id.* at p. 18.

[130]   447 U.S. 773 (1980).

[131]   *Atwood*, 875 F.2d at 1175.

On appeal, Petrobras challenged the district court's finding, as a matter of law, that Atwood faced irreparable harm.[132] The Fifth Circuit found that the record supported a finding of irreparable harm because "if Atwood cannot collect under the letter of credit it will be unable to continue its business operations or its lawsuit against Petrobras."[133] Petrobras argued that a preliminary injunction is inappropriate when the potential harm to the movant is strictly financial. The Fifth Circuit noted, however, that "this is true as a general rule but an exception exists where the potential economic loss is so great as to threaten the existence of the movant's business."[134] The Fifth Circuit also addressed the arguments made here by the Secretary that if Hainkel Home's license ultimately should not have been revoked, it may seek monetary relief thereafter. The Fifth Circuit squarely rejected this approach: "A judgment for damages, acquired years after Atwood's business has been obliterated would not be a meaningful remedy. The district court did not abuse its discretion by granting Atwood's motion for a preliminary injunction."[135]

This Court finds the facts here analogous to *Atwood*. As explained above, the Fifth Circuit directly addressed the validity of the type of irreparable harm pled by Hainkel Home, and has held that in the context of a preliminary injunction, economic harm that would result in the destruction or termination of one's business will constitute irreparable harm. The Court finds that based upon the evidence presented at the preliminary injunction hearing, namely the testimony of Hainkel Home Administrator Robert Rodrigue, Hainkel Home has  demonstrated that the termination of its

---

[132] *Id.* at 1178.

[133] *Id.* at 1178-79.

[134] *Id.* at 1179 (citing *Doran v. Salem Inn, Inc.*, 422 U.S. 922 (1975) (threat of bankruptcy constitutes irreparable harm); *National Screen Serv. Corp. v. Poster Exchange, Inc.*, 305 F.2d 647 (5th Cir. 1962) (no abuse of discretion where denial of injunctive relief would result in destruction of movant's business)).

[135] *Id.*

Medicaid provider agreement would destroy its business before its appeal on the license revocation can be heard and the nursing home license revocation was the basis of the Medicaid provider agreement termination.[136] Therefore, upon this finding, the Court determines that Hainkel Home has demonstrated a substantial likelihood that it will incur irreparable harm in the absence of a preliminary injunction.

Regarding the Secretary's argument that potential transfer trauma to patients should not be considered under the irreparable harm prong, other courts have squarely addressed this issue as well in the same context. In *John E. Andrus Memorial, Inc. v. Daines*,[137] the District Court for the Southern District of New York confronted a nearly identical argument from defendants contending that *O'Bannon* foreclosed the consideration of transfer trauma, and described the argument as "misplaced."[138] The Southern District of New York succinctly explained why defendants' argument under *O'Bannon* failed:

> *O'Bannon* establishes that nursing home residents do not have standing to assert a due process cause of action based on the risk of transfer trauma caused by the federal or state government requiring a facility to close involuntarily; it does not prevent a Court from considering transfer trauma in evaluating irreparable harm for the purposes of determining whether to grant a nursing facility's motion for a preliminary injunction.[139]

---

[136] *See* Tr. R. p. 187 (Q: If the last day Hainkel receives [Medicaid] funding is October 28, 2012, what happens to Hainkel Home– if it receives its last funding on October 28, what happens to Hainkel Home on October 29, 2012? A: We are essentially out of business.) (testimony of Hainkel Home Administrator, Robert Rodrigue).

[137] 600 F.Supp.2d 563 (S.D.N.Y. 2009).

[138] *Id.* at 572.

[139] *Id.*

The court further acknowledged that a nursing facility has an interest in protecting its residents, and that transfer trauma was also a relevant factor in assessing the public interest implications of issuing a preliminary injunction.[140]

At the hearing in this case, Dr. Brobson Lutz testified about the recognized effects of transfer trauma and the likely harm that could result to the residents physical and mental well-being. The Court finds his testimony persuasive. Accordingly, this Court finds that Hainkel Home has presented evidence to establish that it and its patients would suffer irreparable harm in the absence of a preliminary injunction.

### C. Threatened Injury Outweighs Any Harm that Will Result if Injunction is Granted

#### 1. Parties' Arguments

Hainkel Home maintains that while significant harm will result to the home and its patients if the injunction is not granted, "little or no harm will result to the Secretary if the injunction is issued."[141] Hainkel Home cites *D & W Health*, from the Middle District of Louisiana, where the court issued a TRO enjoining the termination of a provider agreement and found that no harm would come to the state as a result.[142] Hainkel Home relies on the *D & W Health* court's reasoning that the state will pay the Medicaid benefits for these patients whether they are in Hainkel Home or another facility.

---

[140] *Id.* at 572-73; *See infra* Part III.D.2 (discussing the effects of transfer trauma in relation to the public interest).

[141] Rec. Doc. 71 at p. 32.

[142] *Id.*

The Secretary argues that the department will, in fact, be harmed by issuance of an injunction because such action would prevent it from "upholding its duty to regulate healthcare in the Louisiana [sic] and to govern the Louisiana Medicaid Program."[143] Therefore, the Secretary claims it would be substantially harmed if the Court issued a preliminary injunction.

### 2. Analysis

Despite the Secretary's arguments, other courts that have considered the potential harm to the government or administrative agencies, have found that injunctive relief to enjoin the termination of a provider agreement would not harm those public institutions.[144] In *International Long Term Care v. Shalala*,[145] the District Court for the District of Columbia encountered similar arguments as made by the Secretary and disregarded them as insufficient to prevent a preliminary injunction:

> The only harm proffered by defendants is the theoretical disruption caused by a court interfering with the administrative process and the Secretary's interest in expeditious provider termination procedures... The Court does not perceive any harm to the government in permitting the ALJ to reach promptly the merits of a live controversy rather than forcing him to wait until after plaintiff is financially dysfunctional and the residents have already been moved. Indeed, an injunction will further the significant public interest both in the smooth functioning of the administrative process and in protecting the residents' interests.[146]

---

[143]   Rec. Doc. 62 at pp. 20-21.

[144]   *See Oak Park*,  2009 WL 331563, at *3.

[145]   947 F.Supp. 15 (D.D.C. 1996).

[146]   *Id.* at 20.

The Court finds this reasoning persuasive. The Secretary has provided no evidence that residents in Hainkel Home are currently in immediate jeopardy.[147] Moreover, the injunctive relief sought by Hainkel Home does not seek to disturb substantive internal findings by the Secretary, but rather to guarantee the effect of a suspensive appeal, to which the Secretary has stipulated it will provide, until after that appellate process is completed. Further, no harm should come to the patients at Hainkel Home because it in undisputed that any and all deficiencies at the facility were addressed/cured before the hearing on the preliminary injunction. Therefore, the Court finds that the harm posed to Hainkel Home and its residents in denying a preliminary injunction outweighs any other harm that would result from not issuing the injunctive relief.

### D. Public Interest

#### 1. Parties' Arguments

Hainkel Home emphasizes that all deficiencies noted by the Secretary have been corrected, and no deficiencies now remain. Moreover, Hainkel Home stresses that there have not been any deficiencies cited in the last three complaint surveys.[148] Therefore, Hainkel Home argues that there "is no concern for the well-being of the residents" in issuing an injunction.[149]

The Secretary maintains that the public would be disproportionally and negatively affected by the issuance of a preliminary injunction because "these public funds are limited and must be

---

[147] Tr. R. pp. 380-81 (Q: As we sit here today in this courtroom, Mr. Secretary, is there a single deficiency assessed against the Hainkel Home relating to patient safety or care that exists on the records of the Department of health & Hospitals, a single one? A: I don't have an answer for that... Q: Would it surprise you to find out that it's zero? A: It would not surprise me.)(testimony of Secretary Greenstein).

[148] Rec. Doc. 71 at pp. 32-33.

[149] *Id.* at p. 33.

spent wisely."[150] Moreover, the Secretary claims that a preliminary injunction would disserve the public because it would "allow a Medicaid provider to operate and receive Medicaid reimbursement while that provider is not providing services to residents that meet minimum standards."[151]

    *2. Analysis*

    As stated above and unrefuted by the Secretary, there are no outstanding deficiencies at Hainkel Home, much less deficiencies that qualify as Immediate Jeopardy.[152] This evidence assuages much of the Court's concern that enjoining the immediate termination of the Medicaid provider agreement would put the residents of Hainkel Home at any risk of harm. No such evidence has been presented to support that position.  The Court recognizes the Secretary's position that scarce funds must be prudently apportioned. However, the nursing home license revocation, which serves as the basis for the termination of the Medicaid provider agreement, is still subject to appeal. Enjoining the Secretary from acting on the suspensive revocation does not prohibit DHH from wisely spending the public's money; rather, ensuring that a thorough and constitutionally required hearing is had before the provider agreement is terminated aides the Secretary is making a comprehensive and correct decision before its action forces Hainkel Home out of business.

    In addition, as acknowledged in *Oak Park*, "in today's fragile economic climate, this Court is also cognizant of the effect the closure would have on [] employees."[153] In his testimony,

---

[150]  Rec. Doc. 62 at p. 22.

[151]  *Id.*

[152]  Tr. R. pp. 380-81 (Q: As we sit here today in this courtroom, Mr. Secretary, is there a single deficiency assessed against the Hainkel Home relating to patient safety or care that exists on the records of the Department of health & Hospitals, a single one? A: I don't have an answer for that... Q: Would it surprise you to find out that it's zero? A: It would not surprise me.)(testimony of Secretary Greenstein).

[153]  2009 WL 331563, at *3.

Secretary Greenstein recognized that in Louisiana there is currently an excess capacity of nursing homes and empty beds, which this Court finds would make Hainkel Home's employees search for employment a difficult endeavor.[154] It would not serve the public interest to allow the Secretary to terminate the employment of 135 people prematurely if at the end of the appellate process it is determined that the nursing home license, and by extension the Medicaid provider agreement, should not have been terminated.

Moreover, the Court again acknowledges the recognized harm of "transfer trauma" and believes that this vulnerable population should only be uprooted if practically necessary and legally warranted. According to testimony presented at the hearing, many of Hainkel Home's residents have resided at that facility for decades and would be susceptible to a significant risk of negative health effects if moved.[155] Finally, Secretary Greenstein testified when asked about what he intended to do with the facility if Hainkel Home does not run it, that he "had not thought [it] through."[156] At a minimum, the Secretary should take the time to decide, even if Hainkel Home's license and Medicaid provider agreement are revoked, if another entity will run the facility at the current site which could eliminate the need to move vulnerable patients, or whether the state intends to use the site for another purpose. For these reasons, the Court finds that the injunctive relief sought would not disserve the public interest.

### F. Security

---

[154] Tr. R. pp. 406-08.

[155] Tr. R. pp. 99-104 (testimony of Dr. Lutz).

[156] Tr. R. pp. 338- 39 (Q: Mr. Secretary, do you as secretary – I don't know any other way to ask it except to ask it. Do you want the Hainkel Home back as a state-run, department-run facility? A: We haven't thought through the future whether we want it back, don't want it back, what we would do.) (testimony of Secretary Greenstein).

Under Federal Rule of Civil Procedure 65(c), a district court may grant a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Hainkel Home contends that security is not necessary in this matter because "defendants will not incur any financial damages if the Court issues injunctive relief."[157] The Fifth Circuit has acknowledged that the amount of the security is within the discretion of the district court, who can elect to impose no security at all.[158] In these proceedings, the Secretary has neither requested security in the event that this Court grants a preliminary injunction, nor has it presented any evidence that it will be financially harmed if it were wrongfully enjoined. Additionally, this Court does not perceive how the Secretary could be harmed by reimbursing Hainkel Home for services provided to Medicaid patients, considering DHH would have to pay the same amount for benefits of these patients regardless of who their Medicaid provider happens to be. Therefore, this Court declines to require a security from Hainkel Home.

## IV. Conclusion

For the aforementioned reasons, the Court finds that Hainkel Home is entitled to injunctive relief enjoining the Secretary from terminating its Medicaid provider agreement during the suspended revocation of its nursing home license. The Court will also enjoin the Secretary from requiring Hainkel Home to notify its residents in a meeting or otherwise of the termination of the Medicaid provider agreement or nursing home license revocation, until all review and appeals in

---

[157] Rec. Doc. 78 at p. 24.

[158] *City of Atlanta v. Metropolitan Atlanta Rapid Transit Authority*, 636 F.2d 1084, 1094 (5th Cir. Unit B Feb. 13, 1981) (citing *Corrigan Dispatch Co. v. Casaguzman, F.A.*, 569 F.2d 300, 303 (5th Cir. 1978)).

connection with the nursing home license revocation action have been exhausted, and only if the nursing home license revocation is ultimately sustained. Accordingly;

**IT IS HEREBY ORDERED** that for the reasons stated above, Hainkel Home's Motion for Preliminary Injunction[159] is **GRANTED**.

**IT IS FURTHER ORDERED** that Secretary Greenstein is enjoined from terminating the Hainkel Home Medicaid provider agreement, prior to Hainkel Home's exhaustion of all review and appeals regarding the nursing home license revocation and then only if supported by a final decision;

**IT IS FURTHER ORDERED** that Secretary Greenstein is enjoined from requiring Hainkel Home to notify its residents in a meeting or otherwise of the termination of the Medicaid provider agreement and/or of the revocation of the nursing home license unless and until all administrative and judicial review and appeals have been exhausted, and only if a final decision supports such action.

**NEW ORLEANS, LOUISIANA**, this 20th day of November, 2012.

**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**

---

[159] Rec. Doc. 2.